IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| DION'E KAEO-TOMASELLI, #A5004463, | ) ) ) | CIV. NO. 11-00669 SOM-KSC |
| Plaintiff, | ) ) ) | ORDER GRANTING MOTION FOR SUMMARY JUDGMENT |
| vs. | ) ) | |
| ABBY MEDRANO, TINA AGARAN, ERIC STEVENSON, | ) ) ) | |
| Defendants. | ) ) | |

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Before the court is Defendants Tina Agaran and Abby Medrano's Motion for Summary Judgment. ECF No. 47. The Motion is unopposed. For the following reasons, Defendants' Motion for Summary Judgment is GRANTED.[1]

### I. PLAINTIFF'S CLAIMS

Plaintiff commenced this action on November 1, 2011, alleging that Medrano and Agaran, nurses employed at the Women's

---

[1] The court exercises its discretion to decide this matter without a hearing . *See* Local Rule LR7.2(d) ("Unless specifically required, the court, in its discretion, may decide all matters, including motions, petitions, and appeals, without a hearing."). This court sometimes holds hearings in cases involving *pro se* prisoners even when they fail to submit written opposition to motions. The court does that to ensure that the prisoners actually received the motions, and to give them an opportunity to orally oppose motions. However, that opportunity makes more sense in the context of motions to dismiss for failure to state a claim than motions for summary judgment that turn on evidence. Moreover, in the present case, Plaintiff participated in a pretrial conference on March 12, 2013, at which she acknowledged that she had the summary judgment motion but had not filed an opposition or sought any discovery.

Community Correctional Center ("WCCC"), had denied and/or delayed adequate medical care to her with deliberate indifference to her health.  *See* Second Amended Compl. ("SAC"), ECF No. 23 PageID #107-08.  Specifically, Plaintiff alleges that Agaran refused to refer her to a physician on October 30, 2009.  Plaintiff alleges that Medrano: (1) gave her incorrect medicine and countermanded her lower bunk and no shackles medical orders on May 6, 2009; (2) refused to refer her to a physician on November 3, 2009; and (3) gave her incorrect medicine again on April 22, 2010.  Plaintiff claims that Defendants' refusal to refer her to a physician resulted in her emergency hospitalization in the Intensive Care Unit ("ICU") of the Castle Medical Center ("CMC") for pneumonia, allegedly damaging her throat.  *Id.*  Plaintiff seeks compensatory damages, "perpetual care upon release," and "reformation" of the Hawaii Department of Public Safety's ("DPS") medical triage treatment procedures.  *Id.* PageID #110.

## II. <u>LEGAL STANDARD</u>

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586–87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W.*

*Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact."  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial."  *Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587); *accord Addisu*, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law."  *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248).  When considering the evidence on a

motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (citations omitted)).

### III.   DISCUSSION

"To sustain an action under section 1983, a plaintiff must show '(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a federal constitutional or statutory right.'" *Hydrick v. Hunter*, 500 F.3d 978, 987 (9th Cir. 2007) (citation omitted), *vacated and remanded on other grounds*, 129 S. Ct. 2431 (2009); *see also West v. Atkins*, 487 U.S. 42, 48 (1988); 42 U.S.C. § 1983.

Defendants argue that Plaintiff cannot show that they denied or delayed her medical care or a referral to a physician, administered incorrect medication, or contravened a medical order for a lower bunk and no shackles with deliberate indifference to her health.  Defendants also argue that Plaintiff's claims that accrued in May and October 2009 are time-barred because she did not commence this action until November 1, 2011.

//

### A.   Deliberate Indifference Standard

"[D]eliberate indifference [by prison personnel] to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' in contravention of the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citation omitted); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). This may be shown by "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 105–06. Deliberate indifference is found when an official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). To determine deliberate indifference, the court must "scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect. . . . While poor medical treatment will at a certain point rise to the level of constitutional violation, mere malpractice, or even gross negligence, does not suffice." *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990). Deliberate indifference can be shown when there has been denial, delay, or intentional interference with medical treatment. *Id.* at 1334. A difference in medical opinion, however, does not constitute deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

**B.   No Denial of Medical Care on October 30 and November 3, 2009**

Plaintiff complains that she asked Agaran (on October 30, 2009) and Medrano (on November 3, 2009) to see a doctor or be taken to the hospital, but that they denied her requests. Plaintiff alleges that this resulted in her emergency transport to CMC and placement in intensive care on life support, and permanently damaged her throat.

The uncontested facts show that, on October 26, 2009, Plaintiff went to the WCCC Medical Unit complaining that she had pneumonia and her throat was sore, and requesting antibiotics. Defs'. Ex. C, ECF No. 48-5 (SEALED) PageID #285. Plaintiff's medical chart reflects that her lungs were clear, she had no fever, had good air exchange, and was told to gargle with salt for her sore throat. *Id.* She was cautioned to return to the clinic "ASAP" if her symptoms persisted or worsened. *Id.* Plaintiff did not alert the WCCC Medical Unit staff then or thereafter that she was HIV positive, although she had been aware of her condition since 2002. *See* Kaeo-Tomaselli Dep., ECF No. 48-2 (SEALED), PageID #270-71.

Two days later, on October 28, 2009, Plaintiff returned to the WCCC Medical Unit still complaining of a sore throat and respiratory problems. *See* ECF No. 48-5 (SEALED), PageID #285. WCCC medical staff admitted Plaintiff to the infirmary for observation until she was fever-free for twenty-four hours. *Id.*,

7

PageID #288.  Plaintiff's medical chart notes that WCCC medical staff reassured Plaintiff that "her lungs are clear" and noted that "she's moving air quite well."[2]  *Id.* PageID #285.  They also notified Dr. Paderes of Plaintiff's condition and complaints.  *Id.*  The chart records that Plaintiff "is non-compliant [with] her [psychotropic] medications . . . . She did not take her meds for the past 2 nights."  *Id.* PageID #286.  Plaintiff was observed with "watchful expectancy" and given Tylenol and increased fluids.  *Id.*, PageID #289.

On October 29, 2009, Plaintiff's fever resolved.  She indicated that she felt better, but she requested cough medicine.  *Id.*, PageID #289.  Dr. Bauman examined her, determined that there was "no need for clinic," and left instructions to increase Plaintiff's fluid intake.  *Id.*  Plaintiff was given her psychotropic medicine and cautioned that if she remained non-compliant, these medications would be discontinued.  *Id.*  She remained overnight in the clinic.  *See* Kaeo-Tomaselli Dep., ECF No. 48-2 (SEALED), PageID #260.

On October 30, 2009, Plaintiff was monitored throughout the day until her fever was stable for twenty-four hours; she was returned to her module at or about 21:15.  *See* ECF No. 48-5 (SEALED), PageID #290.  Three nurses monitored Plaintiff on this

---

[2]  It does not appear that either Medrano or Agaran was involved with Plaintiff's care on October 28, 2009.

date; Agaran signed the medical chart releasing Plaintiff from the infirmary.  ECF No. 48-5 (SEALED), PageID #290.  Plaintiff states that she asked Agaran to take her to the hospital or to see a doctor but claims that Agaran refused.  *See* Kaeo-Tomaselli Dep., ECF No. 48-2 (SEALED) PageID #262.

On October 31, 2009, Plaintiff returned to the infirmary complaining of difficulty breathing and a lack of appetite.  *See* ECF No. 48-5 (SEALED), PageID #292.  Her temperature was elevated (101.5), and her breathing was shallow.  Less than two hours later, however, Plaintiff asked to return to her module.  *See id.* ("Can I go. It's boring." and "Wants to return to housing. States, 'I feel better.'").  Plaintiff was discharged.  *Id.*

Plaintiff was readmitted to the infirmary on November 1, 2009, where she remained until November 3, 2009.  *See* Kaeo-Tomaselli Dep., ECF No. 48-2 (SEALED) PageID #264-65.  (Plaintiff's medical records for these dates are not in the court's record).  Plaintiff says that her condition worsened, and, on November 3, 2009, she was sent to CMC for a chest x-ray.  *Id.*  Plaintiff says the CMC radiologist told her and a WCCC guard that Plaintiff should go to the emergency room.  Either the radiologist did not direct hospital staff to take her there, or hospital staff failed to receive or follow the radiologist's directions.  The upshot was that Plaintiff was discharged from

CMC and returned to WCCC.  *Id.*  On arrival at WCCC, Plaintiff was returned to her housing module.

Within a few hours, Plaintiff returned to the WCCC Medical Unit.  Plaintiff said she was dizzy and lost consciousness for awhile.  While Medrano retrieved oxygen, Plaintiff told a guard that she felt as if she were dying.  The guard allegedly relayed this information to Medrano when she returned and administered the oxygen.  *Id.*  Plaintiff was then sent back to CMC (which is less than two miles from WCCC) and admitted to the ICU.  *Id.* PageID #266-68.  Plaintiff disclosed her HIV status to CMC personnel on November 3, 2009.  *Id.* PageID #270.

David Saldana, M.D., who is employed by the Hawaii Department of Public Safety and provides medical care to inmates at WCCC, reviewed Plaintiff's medical records from WCCC and CMC regarding this respiratory infection incident.  *See* Saldana Decl., ECF No. 48-6.  Dr. Saldana states, "I must conclude that given the information available to WCCC staff at the time, . . . a self-limiting viral infection was a reasonable and justified working diagnoses during the early phases of the clinical disease process."  *Id.*, PageId #296.  Dr. Saldana notes that, when Plaintiff's condition deteriorated, "a transfer to the hospital was indicated and occurred."  *Id.*

Dr. Saldana opines that, based on his review of Plaintiff's medical records from the CMC, "it appears that an accurate diagnosis was delayed due to the withholding of pertinent medical history." *Id.*, PageId #297. He says, "Had [Plaintiff] disclosed her HIV status[,] the medical staff at WCCC would have followed a different course of treatment designed to account for her true medical condition." *Id.* Dr. Saldana states that, in his medical opinion, based on his education, training, and experience, Plaintiff received timely and appropriate medical care at all times during this incident. *Id.*

### 1. *October 30, 2009: Claims Against Agaran*

Plaintiff was treated at the WCCC infirmary on October 26, then admitted to the WCCC infirmary on October 28, 2009, where she remained for two days. Dr. Bauman monitored, treated, and examined Plaintiff on October 29, 2009, and cleared her for release the next day. By October 30, 2009, Plaintiff's fever was gone and she exhibited no other symptoms. Agaran released Plaintiff in accordance with Dr. Bauman's orders, after her fever had stabilized for twenty-four hours.

Plaintiff reentered the infirmary the next day at her own request, but was discharged less than two hours later, again at her own request. Plaintiff admits that she failed to notify anyone at the WCCC Medical Unit at any time that she was HIV positive. Pl. Dep., ECF No. 48-2 PageID #270. Had she done so,

this might have alerted Dr. Bauman and the other WCCC medical personnel to pursue a different course of treatment.  There is no genuine issue of material fact as to whether Agaran provided Plaintiff with timely and appropriate medical care on October 30, 2009, based on the symptoms Plaintiff presented and the information she had disclosed, and in light of Dr. Bauman's specific orders to release Plaintiff the next day if her fever was stable.  Plaintiff's claims against Agaran fail as a matter of law.

       *2.    November 3, 2009*

       Plaintiff admits that she was sent to CMC twice on November 3, 2009, where she was treated by a radiologist and later admitted, contradicting her claim that Medrano "refused to refer [her] to a doctor," or denied her access to medical personnel on this date.  There is no evidence that Medrano delayed sending Plaintiff to CMC or ordered CMC to release Plaintiff after the chest x-ray was taken, even assuming Medrano had the power to do so.  Thus, there is no genuine issue of material fact as to whether Medrano refused to refer Plaintiff to a physician or failed to provide appropriate and timely medical care to Plaintiff on November 3, 2009.  Plaintiff's claims against Medrano regarding the November 3, 2009, incident fail as a matter of law.

12

Defendants' Motion for Summary Judgment is GRANTED on Plaintiff's claims that Medrano and Agaran failed to provide her with adequate medical care on October 30, and November 3, 2009.

**B. Rescission of "No Shackle" and "Lower Bunk" Orders**

Plaintiff alleges that Medrano rescinded physician orders prescribing her a lower bunk and no shackles. Medrano reviewed Plaintiff's medical records and states that there are no such medical orders in Plaintiff's file. Plaintiff fails to produce these orders or any other support for this claim, such as a statement from the doctor who allegedly issued the no shackle and lower bunk orders. Plaintiff cannot simply rest on the allegations in her pleadings to oppose summary judgment. *See Anderson*, 477 U.S. at 247–48. She must show more than a "metaphysical doubt" that these medical orders exist and that Medrano rescinded them with deliberate indifference to Plaintiff's health or safety. Plaintiff fails to show that there is a genuine issue of material fact concerning the alleged denial of the no shackle and lower bunk orders, and summary judgment is GRANTED as to this claim.

**C. Incorrect Medication**

Plaintiff alleges that Medrano gave her incorrect medication on May 6, 2009, and April 22, 2010. She claims that she suffered an allergic reaction from Medrano's alleged mistake.

13

Medrano denies that she gave Plaintiff incorrect medicine on either date. Medrano Decl., ECF No. 48-4 PageID #276. Medrano states that she does not prescribe medicine to inmates, but simply provides prescriptions that are issued by the inmate's physicians. *Id.* Medrano says that her practice is to ascertain that the medication prescribed by a physician is the medication given to an inmate before she dispenses it. *Id.*, PageId 3277. If an inmate says the medication is incorrect, Medrano will compare the medication to the prescription in the inmate's records to verify. If the inmate's chart indicates that incorrect medicine was dispensed, Medrano would correct the mistake. *Id.*

### 1.  *May 6, 2009*

Plaintiff's medical records show that she was seen at the WCCC Medical Unit on May 4, 2009, for boils. ECF No. 48-5 PageId #279. The chart indicates that Dr. Paderes was notified. *Id.* ("A/P - T.C. Dr. Paderes; Dr. aware of previous infections"). Dr. Bauman prescribed Bactrim, a sulfa medication,[3] for seven days, and ordered that a "C&S" (culture and sensitivity) test be performed when the boils began to drain. *Id.* Medrano's name is

---

[3] Bactrim contains a combination of sulfamethoxazole and trimethoprim and is supplied in tablets and a liquid suspension. Sulfamethoxazole and trimethoprim are both antibiotics that treat different types of infection caused by bacteria. http://www.webmd.com/drugs/drug-5530-Bactrim. (last visited Mar. 6, 2013).

not on the chart on this date, and there is no evidence that she was the attending nurse when Bactrim was prescribed or given to Plaintiff.

On May 5, 2009, Plaintiff returned to the clinic for treatment for her toe.  Medrano noted that Plaintiff's boils were improved and that she was "responding to Bactrim." *Id.*  On May 6, 2009, Plaintiff returned to the clinic again.  Medrano treated Plaintiff's toe, examined her boils, and changed her dressings. *Id.*  Medrano gave Plaintiff Tylenol for her fever, and told her to return at 5:00 p.m. to have her temperature and dressings rechecked.  Medrano then conferred with Dr. Saldana regarding this treatment and Plaintiff's temperature.  Dr. Saldana instructed Medrano to discontinue the Bactrim, start 500 mg. of Cipro, and have certain lab tests done.  *Id.*, PageID #279-80. Another nurse, Rick Richy, R.N., notes that, at or about 11:00 p.m., he received a call from a guard relating that Plaintiff was feeling ill.  Richy told the guard to contact the clinic if Plaintiff's condition changed or failed to improve.  *Id.*, PageID #280.

On May 7, 2009, Plaintiff returned to the clinic complaining of vomiting, diarrhea, and chills.  *Id.*  She had a fever and was given Tylenol.  Plaintiff later asked to return to her housing unit so that she could eat regular food.  *Id.*, PageId #281.  Plaintiff also complained that she had been given the

wrong medication the night before. Dr. Bauman examined Plaintiff, noted her boils, rash, itching, and "general dermatitis," and noted in her medical chart, "Sulfa allergy (unlikely Cipro, I believe)." *Id.* PageID #282. Dr. Bauman prescribed tetracycline, erythromycin, Flagyl, and Benadryl, and discontinued the Cipro. Medrano followed Dr. Bauman's directions and administered these medications.

Plaintiff's medical records do not show that Medrano was deliberately indifferent to Plaintiff's serious medical needs. That Plaintiff had a reaction to either Bactrim or Cipro does not, of itself, subject Medrano to liability. As noted, liability turns on subjective intent - whether Medrano was deliberately indifferent to Plaintiff's serious medical needs. The uncontroverted facts establish that Medrano did not prescribe either Bactrim or Cipro, but administered them on Dr. Saldana's and Dr. Bauman's orders. The evidence establishes that Dr. Bauman and Dr. Saldana adjusted Plaintiff's treatment as soon as they became aware of Plaintiff's reactions. Plaintiff's medical chart establishes, without dispute, that Medrano, Bauman, Saldana, and others at the WCCC Medical Unit responded to Plaintiff's changing conditions in a timely, appropriate manner. Plaintiff provides nothing to controvert this conclusion.

Plaintiff's allegation that she was given the wrong medication establishes, at most, negligence, not deliberate

indifference.  Negligence does not support a claim under the Eighth Amendment.  *See Estelle*, 429 U.S. at 106 (stating that a claim "that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004).  Medrano is entitled to summary judgment regarding the May 6, 2009, incident.[4]

### 2. *April 22, 2010*

Plaintiff alleges that Medrano also gave her incorrect medicine on or about April 22, 2010.  Plaintiff's medical records show that she was not seen at the WCCC Medical Unit on April 22, 2010, however.  *See* ECF No. 48-4 PageID #293 (showing that Plaintiff saw Dr. Saldana on April 20 and 27, 2010, and was given Tylenol and a Barium swallow esophagram).  During her deposition, Plaintiff stated that Medrano gave her four pills on or about April 22, 2010, including two Vistaril and two Doxepin, when she had been prescribed 75 mg. of Doxepin.  Pl. Dep., ECF No. 48-2, PageID #254.  Plaintiff claimed that when she pointed this out to

---

[4] In light of this, it is unnecessary to address Defendants' argument that Plaintiff's claims accruing before November 1, 2009, are untimely.  The record does not establish whether the statute of limitation was tolled while Plaintiff grieved these issues, or whether Plaintiff was entitled to equitable tolling during her illnesses.

Medrano, Medrano told her that her medications had been changed. *Id.*, PageId #255. Plaintiff said she had a hard time waking up the next morning, was dizzy, and her eyes were red. *Id.* PageId #256. Plaintiff admitted, however, that once she woke up she did not seek medical care. *Id.* PageId #257.

Defendants submit that, based on Plaintiff's deposition responses, she may be referring to **May 6, 2010**, when Dr. Wendler prescribed her Doxepin. *See* Pl. Dep., ECF No. 48-2 PageID #254. Plaintiff's medical chart does not show that Medrano had *any* involvement with Plaintiff between April 15 and May 12, 2010, when Medrano made a treatment note in Plaintiff's chart. If Plaintiff was given the wrong medication on May 6, 2010, she did not seek treatment for this and there is nothing to show that Medrano was involved. Moreover, Defendants submit evidence showing that a common side effect of Doxepin is drowsiness, the effect Plaintiff claims she experienced. Plaintiff's allegations regarding this incident are unsupported by the record and insufficient to defeat Defendants' motion for summary judgment. Medrano is GRANTED summary judgment on this claim.

## IV. DISMISSAL OF DEFENDANT STEVENSON

On December 27, 2012, more than a year after Plaintiff was ordered to serve Defendants, the court granted Plaintiff an extension of time to serve Defendant Eric Stevenson. ECF No. 50. Plaintiff was told to provide an address for Stevenson to the

18

U.S. Marshals within thirty days of the Order.  There is no indication in the record that Plaintiff has done so, and Stevenson remains unserved.  The deadline for service of process has long passed.  Accordingly, Defendant Eric Stevenson is dismissed from this action, without prejudice to the filing of a new action against Stevenson if Plaintiff locates him.

## V.  CONCLUSION

Defendants Tina Agaran and Abby Medrano's Motion for Summary Judgment is GRANTED.  Defendant Eric Stevenson is DISMISSED without prejudice.  The Clerk is instructed to enter judgment and close the file.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 19, 2013.



/s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

*Kaeo-Tomaselli v. WCCC Medical Unit,* Civ. No. 11-00669 SOM-KSC, ORDER GRANTING MOTION FOR SUMMARY JUDGMENT; G:\docs\prose attys\Ords\DMP\2013\Tomaselli 11-669 SOM (MSJ).wpd